UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **Plaintiff,** | : | Criminal Action |
| | : | No. 14-066 |
| **v.** | : | |
| | : | |
| **SAENA TECH CORPORATION,** | : | July 17, 2014 |
| | : | 9:45 a.m. |
| | : | |
| | : | |
| **Defendant.** | : | Washington, D.C. |
| | : | |
| ............................. | : | |

**TRANSCRIPT OF MOTION HEARING PROCEEDINGS**
**BEFORE THE HONORABLE EMMET G. SULLIVAN,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the United States:      **Bryan G. Seeley, Assistant U.S.**
**Attorney**
U.S. ATTORNEY'S OFFICE
Criminal Division
555 Fourth Street, NW
Washington, DC 20530
(202) 252-1749
Email: Bryan.Seeley@usdoj.gov

**Michael K. Atkinson, Assistant U.S.**
**Attorney**
U.S. ATTORNEY'S OFFICE
555 Fourth Street, NW
Washington, DC 20530
(202) 252-7817
Fax: (202) 307-2304
Email: Michael.atkinson2@usdoj.gov

For the Defendant:      **Steven Brizek, Esq.**
KIM & BAE, P.C.
2160 North Central Road, Suite 303
Fort Lee, NJ 07024
(201) 585-2288

APPEARANCES: Cont.

On behalf of the          **Bernice A. Harleston, Esq.**
Defendant:                THE HARLESTON LAW PRACTICE
                          27 W. Jefferson Street
                          Suite 201
                          Rockville, MD 20850
                          (301) 610-9797
                          Fax: (301) 340-0796
                          Email: Bharleston@hotmail.com

                          **Sucheol Noh, Esq.**
                          Unit 501, Opulence B/D 1553-5
                          Seocho-dong
                          Seocho-gu, Seoul Korea 137-873
                          82-2-598-3660


Court Reporter:           **Scott L. Wallace, RDR, CRR**
                          Official Court Reporter
                          Room 6503, U.S. Courthouse
                          Washington, D.C. 20001
                          202.354.3196
                          scottlyn01@aol.com

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

<u>**MORNING SESSION, JULY 17, 2014**</u>

1

2   (9:54 a.m.)

3        THE COURTROOM CLERK:  Good morning, Your Honor.

4        THE COURT:  Good morning.

5        THE COURTROOM CLERK:  This is Criminal Case 14-066, *United*

6   *States of America versus Saena Tech Corporation*.

7        And, Your Honor, interpreters Myung Jaoh and Hea Park have

8   been sworn for the record.

9        THE COURT:  Good morning.

10        THE COURTROOM CLERK:  Will all parties please come forward

11   and identify yourselves for the record, please.

12        MR. SEELEY:  Good morning, Your Honor.  Bryan Seeley on

13   behalf of the Government.  I'm joined at counsel table by Michael

14   Atkinson.

15        THE COURT:  All right.  Good morning, Counsel.

16        MR. ATKINSON:  Good morning.

17        THE COURT:  Just the attorneys.

18        MR. BRIZEK:  Good morning, Your Honor.  Steven Brizek from

19   the firm of Kim & Bae in New Jersey acting as co-counsel for

20   Saena Tech Corporation and counsel for Jin Seok Kim.  I have been

21   admitted *pro hac vice*, and my local counsel is present, Bernice

22   Harleston.

23        THE COURT:  All right.  Good morning.

24        MS. HARLESTON:  Good morning, Judge Sullivan, Bernice

25   Harleston.

1          THE COURT:  All right.  Good morning.

2          MR. NOH:  Good morning, Your Honor.  Sucheol Noh, counsel

3     for Saena Tech.

4          THE COURT:  All right.  Good morning, sir.

5          Let me just say a few things before we proceed.  So this

6     matter is before the Court for purposes of the Court considering

7     and potentially approving the motion for deferred prosecution

8     agreement.  Let me first inquire of those parties in need of an

9     interpreter, whether they can hear the interpreter and understand

10    the interpreter?  You can?  All right.

11         There are a couple of concerns the Court has before we

12    proceed, recognizing that people will have to make

13    representations and statements under oath.  One concern that the

14    Court has is whether or not this deferred prosecution agreement

15    essentially has the affect of immunizing Mr. Kim.  Mr. Kim,

16    according to the representations made in the pleadings, was a

17    principal participant in a bribery scheme of an unidentified

18    public official.  As far as this Court knows he's not been

19    immunized from prosecution, although the agreement purports to

20    provide that -- or does provide that, as part of this agreement,

21    the Government has announced its decision not to prosecute him

22    for any offenses arising out of this scheme.  That's a principal

23    concern.

24         The other concern the Court has is, with respect to

25    fundamental fairness of this agreement, if Kim is not prosecuted

1    and will have no criminal record as a result of this agreement,

2    the question the Court has is whether or not this agreement is

3    fair, and especially when viewed against all the other agreements

4    that the Court has approved, and recognizing that a significant

5    number of people who have arguably had less criminal culpability

6    have received jail sentences.  I mean, I'll list the names for

7    the record, although the record is clear who they are:  Michael

8    Alexander was sentenced to 72 months; James Edwards Miller was

9    sentenced to 70 months; Robert McKinney, 36 months; Harold Babb,

10   87 months; Larry Corbit, 27 months; Theodore Hallis, 15 months;

11   Nazi Cam, 24 months; Lee Kahn, 37 months; Keri Kahn, 235 months;

12   Oh Sung, 46 months; Helen Woo, 24 months of probation; and Chia

13   Chong, 24 months of probation.

14        And, you know, according to whether or not the fact that

15   all of those individuals received prison terms, with the

16   exception of two, and Mr. Kim is neither prosecuted nor has he

17   received immunity, will not have a criminal record, no criminal

18   responsibility and, of course, no jail term, according to whether

19   or not principles of fundamental fairness should factor into the

20   Court's decision as to whether the Court should accept this

21   deferred prosecution agreement or not.

22        And I'm saying all this upfront because I didn't want to

23   go through a process where Mr. Kim is testifying under oath --

24   and he will be required to testify under oath.  He's not been

25   immunized, and at the end of the day, if the Court decides not to

1  accept the deferred prosecution agreement -- I'm not expressing

2  any opinion right now as to whether the Court will accept it or

3  not accept it.  I'm just concerned, and should be concerned,

4  about where that leaves Mr. Kim, if, indeed, the Court determines

5  after he's testified under oath about his criminal scheme, where

6  that leaves him, and especially since he's giving up certain

7  fundamental Constitutional rights as part of this agreement; and

8  one of those rights being the right not to incriminate himself

9  further.

10      So again, I just want to put that upfront.  It may well be

11  that the Court will ask the Government to respond in writing.

12  I'm especially concerned about what appears to be some sort of

13  imperfect immunity agreement for Mr. Kim.  Of course, the

14  Government retains the right to immunize him, retains the right

15  to immunize anyone, and I can understand why the Government may

16  not want to immunize him, especially if he's going to be a

17  witness in a trial because of the immunized witness instruction

18  that's given to jurors, view the testimony with skepticism, pause

19  when you hear the testimony, I can appreciate that.

20      But the Court also has to be concerned about, not only

21  justice, but the appearance of justice.  And, indeed, is this

22  type of an agreement fair and just, considering the factors that

23  the Court has just alluded to?  And notwithstanding the Court's

24  concerns, does there exist a basis in law for the Court to accept

25  or, indeed, reject the plea agreement?

1       If you want to respond, you can.  What I'll probably do,

2  unless there are objections, is go through the colloquy and just

3  reserve judgment on the issue of whether the Court should accept

4  this agreement or not, recognizing he's going to have to testify

5  under oath, or if you want to hold off on that, that's fine with

6  me.  It was not possible to raise these concerns earlier than

7  today, but I'm raising them now before we proceed any further.

8  So if you wish to respond to address -- what I'll probably do is

9  require some written response as well, but if you want to address

10 any of the Court's concerns, you certainly have the opportunity

11 to do so now, Counsel.

12      MR. SEELEY:  Thank you, Your Honor.  I would like to

13 address the Court's concerns.

14      THE COURT:  Sure.

15      MR. SEELEY:  First of all, with regard to the immunity,

16 Your Honor, the agreement essentially offers Mr. Kim letter

17 immunity, but it's contingent upon his cooperation.  So if

18 Mr. Kim, during the two-year period of the DPA, cooperates with

19 the Government and part of his cooperation is going to be

20 testifying in a trial scheduled for September 23rd, and if he

21 cooperates in other ways providing information for the

22 Government, including against individuals besides the individual

23 charged in that case that's going to trial, then the

24 Government -- the U.S. Attorney's Office in D.C. has agreed not

25 to bring charges against him.

1        So I don't think there's anything hidden or under the

2   table.  This agreement is something that certainly the defendant

3   in the trial in September already knows about.  You know, I don't

4   know whether --

5        THE COURT:  The word "immunity" doesn't appear in this

6   agreement, does it?

7        MR. SEELEY:  It doesn't appear in the agreement, but

8   there's no strategy behind that, Your Honor.  It's --

9        THE COURT:  I mean, I wouldn't -- I wouldn't fault you.

10  If I were in your shoes I'd probably try to accomplish the same

11  objective, probably, but it's immunity.  It is immunity.

12       MR. SEELEY:  Right.  It's letter --

13       THE COURT:  Yeah.

14       MR. SEELEY:  It's letter immunity contingent on

15  cooperation.  Yeah, I don't -- and certainly the Government's not

16  running away from the word "immunity" here, either.  And I

17  haven't -- you know, we haven't gotten to jury instructions or

18  anything in the trial in September, so I don't know what the

19  arguments will be then.

20       THE COURT:  Oh, I'm sure there will be an argument about

21  that, inquiring whether or not that's in the permissible scope of

22  cross-examination of the witness, too.  I don't know.  I don't

23  know if the witness --

24       MR. SEELEY:  Oh, I'm sure Mr. Kim will be cross-examined

25  on the agreement.  And, in fact, you know, I'm fairly confident I

1    will address that in my direct examination of Mr. Kim, so there
2    will be no --
3          THE COURT:  Just to take this steam out of that, huh?
4          MR. SEELEY:  Yeah.  The jury in Virginia will certainly
5    hear about this agreement, and --
6          THE COURT:  Yeah.  What about the fundamental fairness,
7    though?  I mean, he gets a free ride, and a lot of people have
8    gone to jail arguably for lesser criminal culpability.
9          MR. SEELEY:  Right.  And I would say, Your Honor,
10   certainly this disposition here is thus far the only disposition
11   where an individual or a company has not been prosecuted.  I
12   don't think it's a free ride.  There are -- it's certainly a
13   better ride than the other defendants, as Your Honor has
14   identified.
15         THE COURT:  Absolutely.
16         MR. SEELEY:  There are obligations in the agreement,
17   including the cooperation obligation, the obligations that the
18   company has to take on, so there are things that Mr. Kim and the
19   company needs to do.  The Government did not come to this
20   decision lightly about whether to reach this deferred prosecution
21   agreement, and, you know, I'd like to go into some of the
22   considerations, if I may.
23         THE COURT:  Sure, sure.
24         MR. SEELEY:  So Your Honor understands, Saena Tech is a
25   Korean corporation, Korean company based in Korea, does its work

1    in Korea; no work in the United States at all.  Mr. Kim is a

2    Korean national, did his work for Saena Tech in South Korea, was

3    not doing work here in the U.S., and so there are obstacles with

4    regard to a prosecution brought against a South Korean national

5    not in the United States, and so the Government took that into

6    account in deciding what kind of resolution to reach here.

7    Mr. Kim's cooperation is extremely important to the Government

8    with regard to the case in September and with regard to

9    potentially future cases and the continuation of the

10   investigation, and so a decision needed to be made about what was

11   the best way to secure Mr. Kim's cooperation, given --

12       THE COURT:  Let me ask you this:  Could he not have been

13   indicted and extradited to this country?

14       MR. SEELEY:  He certainly could have been indicted,

15   assuming the grand jury found probable cause here, he could have

16   been indicted, and we could have sought extradition.  I believe

17   we could have.  How long that process would take, I don't know.

18   We came to the conclusion that that process would make it

19   impossible for Mr. Kim to testify in the trial in September.  We

20   didn't think we would get him here then.

21       THE COURT:  His testimony is critical?

22       MR. SEELEY:  His testimony is critical, Your Honor.  But

23   beyond just that, beyond the need for his testimony and the

24   logistics with Korea, with getting him from Korea, I will say

25   that Mr. Kim came here to talk to the Government -- and I don't

1   remember the exact date, it was at least over a year ago, a year

2   or more -- and he volunteered a lot of the information that Your

3   Honor sees in the statement of offense that's attached to this

4   DPA.  This is information the Government did not know, including:

5   The $30,000 bribe payment; the $40,000 bribe payment; and the

6   $250,000 fraudulent invoice of which the vast majority went to

7   Mr. In Seon Lim.  And so the big pieces of this bribery scheme,

8   the big items in the statement of offense are items that the

9   Government did not know about that Mr. Kim volunteered, stepped

10  forward and volunteered, and not only volunteered them, but came

11  to the United States to talk to us and tell us about this.  This

12  is in marked contrast to the defendants that Your Honor mentioned

13  initially, like Keri Kahn and others, like Thomas Kwon who we had

14  to find out about this stuff first.  Now, we had an inkling from

15  the investigation that -- early on that Saena Tech was probably

16  paying bribes to Mr. Lim, but in terms of the details, the

17  amounts of this fraudulent invoice, we just didn't know that

18  information, so that played in, just as in when a company comes

19  forward and admits to wrongdoing in a case in which the

20  Government doesn't really know the details, that's taken into

21  account.  That's something we really took into account here, and

22  not just coming forward with the details, but coming all the way

23  over from the United States [sic] when he could have really just

24  hunkered down in South Korea.

25        THE COURT:  He knew he was the subject of an

1    investigation, though, did he not?

2         MR. SEELEY:  Yes.  Yeah, but he could have hunkered down

3    in South Korea and, you know, we probably would not have even

4    developed enough evidence to indict him, would be my speculation.

5    We might have, but I speculate we might not have.  So really,

6    there might have been no prosecution at all unless Mr. Kim had

7    come forward and volunteered, so that played a large role in the

8    decision here as well.

9         And I will say, Your Honor, that our expectation is that

10   now with this deferred prosecution agreement, Mr. Kim's company,

11   Saena Tech, they are not going to be doing any U.S. Government

12   contract work in Korea.  That is over.  And I think that was a

13   very large chunk of their business, so the company has taken a

14   large hit here, too.  So again, just sort of going to the fact

15   that it's not totally a free ride.

16        THE COURT:  Is that, though, the -- the exclusion for

17   doing business, is that for the two-year period, though, of the

18   agreement, or --

19        MR. SEELEY:  Your Honor, I don't -- it's not part of the

20   agreement.  It really has to do with the debarment authorities.

21   So we at the U.S. Attorneys' Office don't have a say in whether

22   the U.S. Government continues to contract with Saena Tech or not,

23   but I can tell you from what I know about the debarment process

24   and how I understand it works.  You know, this company is almost

25   assuredly going to be permanently debarred.  This is not going to

1    be a two-year term.  But again, Your Honor, we don't make those

2    decisions, but in doing the research we've done and talking to

3    the people that we have, that is my understanding, and that was a

4    factor in our reaching this decision.

5          There's also the fact -- I don't know what the Korean

6    authorities are going to do, but Mr. Kim could be prosecuted in

7    Korea.  There is the potential for that.  I don't know whether

8    they will go forward with that or not, but our agreement only

9    covers, you know, our office and our ability to prosecute him.

10         So I think the Court is absolutely right to question the

11   fairness of this, given the fact that there is no jail time,

12   given the fact that there is letter immunity contingent on

13   cooperation.  But I think the combination of Mr. Kim's voluntary

14   disclosures, the importance of his cooperation in the

15   continuation of the investigation in an upcoming trial, and also

16   the effect that this will have on his company and the monetary

17   penalty that he will also pay, which is twice the amount of the

18   loss to the Government in this case, I think all of that led us

19   to believe that this was the correct resolution to reach here.

20         THE COURT:  Let me ask you this:  As a matter of law,

21   should the question of fairness impact the Court's decision to

22   accept or reject a deferred prosecution agreement?

23         MR. SEELEY:  Um, is the Court's question about what should

24   go into the Court's decision or the Court's authority?

25         THE COURT:  Well, both.

1          MR. SEELEY:  Okay.  Um, I think --

2          THE COURT:  In other words, if the Court hypothetically

3     had concerns -- and I've articulated some concerns about the

4     fairness, recognizing that others arguably less culpable have

5     gone to jail and this man is not even being prosecuted and would

6     have no record, no conviction, nothing, as a matter of law -- I

7     mean, the Court has -- the Court -- and the Court said this

8     before:  The Court's not a rubber stamp.  We -- the judges are

9     not rubber stamps for these agreements, so --

10         MR. SEELEY:  Right --

11         THE COURT:  -- there must be some discretion that a court

12    has to determine whether to accept or reject an agreement and

13    inquire whether or not the issue of fairness as it impacts

14    others, or as it's perceived in this proceeding by the public,

15    whether that should factor into the Court's decision to accept or

16    reject the plea, the deferred prosecution agreement.

17         MR. SEELEY:  Yeah.  I think --

18         THE COURT:  Because otherwise why have a judge do this?

19         MR. SEELEY:  Well --

20         THE COURT:  If the executive branch can just go ahead and

21    enter into these agreements, why have a judge sitting up here?

22         MR. SEELEY:  Yeah.  Right.  Your Honor, I think there's

23    a -- I think there's a role for the Court in this, and -- a

24    several-part role here.  Part of the role is to determine

25    whether, you know, the people here today have the authority to

1    bind the company.  Part of the role here is to determine whether

2    the waiver of indictment is knowing and voluntary.  Part of it is

3    whether the waiver of speedy trial is knowing and voluntary.

4    Part of it is to decide whether the Speedy Trial Act should be

5    tolled.  That's Your Honor's decision.

6         I think there's more of an open question about, you know,

7    court's authorities to approve or disapprove DPAs based on things

8    like fundamental fairness or whether individuals should be

9    prosecuted.  I think courts are potentially reaching different

10   conclusions on that.

11        THE COURT:  Are they being guided by any precedent?

12        MR. SEELEY:  Your Honor, the -- I think the -- I have

13   recently read some items on this topic, and what I have read --

14   not doing my own independent research, but what I've read is that

15   the case law is pretty barren.  But I can say that with regard

16   to -- there's a case in Connecticut with -- I believe it's the

17   Royal Bank of Scotland where the judge determined that you know,

18   the judge's role is to rule on speedy trial and some of those

19   other procedural rights I talked about, and not to weigh in on

20   whether the DPA itself is fundamentally fair --

21        THE COURT:  Really.

22        MR. SEELEY:  -- or the public --

23        THE COURT:  Was that a district decision or was that a

24   circuit?

25        MR. SEELEY:  I believe that was the District of

1    Connecticut, a district decision.  And then --

2         THE COURT:  Is that a published decision?

3         MR. SEELEY:  If Your Honor could just give me one second.

4         THE COURT:  Sure, sure.

5         MR. SEELEY:  Your Honor, I'm not aware of a public

6    decision, but I can given the Court the docket number of the

7    case --

8         THE COURT:  Okay.

9         MR. SEELEY:  -- which is 13-CR-74, and it's a District of

10   Connecticut case, and it is the Royal Bank of Scotland.

11        THE COURT:  Do you know who the judge was?

12        MR. SEELEY:  The initials are MPS, Your Honor, but I do

13   not know the name.  But in that case the District Court, you

14   know, approved the party's agreement to exclude time under the

15   speedy trial, and, you know, engaged in a colloquy that I just

16   was describing about whether the waivers were knowing and

17   intelligent.

18        Then in a case involving a DPA with HSBC, the court took a

19   different view and went on to evaluate, you know -- it seems to

20   me, went on to evaluate the fairness of this, and that was

21   12-CR-763.

22        THE COURT:  7603?

23        MR. SEELEY:  763.

24        THE COURT:  763.

25        MR. SEELEY:  12-CR-763, Judge JG.  And I'm trying to find

1      the court.  I'll try to find the --

2             THE COURT:  Sure.

3             MR. SEELEY:  -- court before the end of this hearing on

4      that.  But -- so if Your Honor does decide that, you know, your

5      role is to pass on the fundamental fairness of the DPA, I think

6      we've offered the reasons why it is fair.

7             And another thing I would say is that there is a lot of

8      criticism -- you can see a lot of criticism in the public

9      generally about the failure to prosecute individuals, but I think

10     this is a case -- if you looked at this investigation as a whole,

11     the Government has done that.  The Government has prosecuted both

12     companies, but a lot -- a lot of individuals, and so I think a

13     wider lens needs to be taken on that.

14            And with regard to the fund -- I perceive Your Honor's

15     concern to be more fundamental fairness related to other

16     defendants.

17            THE COURT:  Well, that's one of the factors.  I was really

18     concerned about the fact that -- you can read the documents that

19     says this is an immunity deal, but the Government's not done

20     everything that it has to do, and it's quite a process, as you

21     well know better than the Court, to get immunity for someone.  A

22     letter of immunity probably is a letter immunity.  It's

23     interesting that the words "immunity" don't appear there.  I'm

24     not accusing you of hiding the ball.  I mean, it is what it is.

25     And any outstanding criminal defense attorney would cross-examine

1    the witness at trial about his immunity deal --

2          MR. SEELEY:  Right.

3          THE COURT:  -- and probably trigger that instruction that

4    you don't want, you know, but the instruction that the judge will

5    probably give.  I don't know what the judge will do, but it's a

6    powerful instruction.

7          MR. SEELEY:  Yeah.  And they'll probably have the

8    transcript of this hearing today where I called it letter

9    immunity contingent on cooperation.

10         But the fact is I'm willing to do that because we're

11   not -- we're not running from it.

12         THE COURT:  Yeah, but you don't have to testify either, so

13   you haven't been cross-examined.  We have a transcript, so good

14   luck.

15         MR. SEELEY:  Maybe as a party opponent, then.  I will

16   argue it it's not.

17         But the point is, I think with letter -- there are

18   different levels of review we have to get for different types of

19   immunity.

20         THE COURT:  Right.

21         MR. SEELEY:  With letter immunity we generally do not need

22   to go to Main Justice.

23         THE COURT:  I know, right.  That's right.  To get

24   full-blown immunity it's quite a process.

25         MR. SEELEY:  Right, it is.

```
1          THE COURT:  I mean, it's up to the Deputy AG, I think,

2     right, or to the AG?

3          MR. SEELEY:  I don't know, Your Honor.

4          THE COURT:  I think it's Deputy AG.  I think it's that

5     high up, or maybe it used to be Lanny Breuer, I think.  Maybe he

6     was head of criminal, I think, wasn't he?

7          MR. SEELEY:  He was the head of -- yes, he was the AG for

8     criminal.

9          THE COURT:  Right.

10          MR. SEELEY:  But here -- so here, we did not have to go

11     through those steps, but this is, as I said, it is letter

12     immunity contingent on cooperation, so we're not --

13          THE COURT:  Right.  You know, these cases are very

14     interesting.  They're also difficult, too, because this is the

15     nontraditional -- it's not a traditional adversarial proceedings.

16     There's no one else on the other side -- there's no one else in

17     the courtroom raising concerns.  And the Court's mindful of its

18     job.  The Court cannot be an advocate, but again, you know, I'm

19     not -- you know, I'm not just an unwitting participant here, so I

20     have to raise these questions.  But the fact that all these

21     people have gone to jail is troubling, and I have not had many of

22     these cases.  I had to preside over the Barclays case and maybe

23     one or two others.  Barclays was very interesting in that there

24     was some of the same concerns articulated by the Court.  But in

25     Barclays it was a traditional, non-deferred prosecution agreement
```

1    where the Government agreed not to prosecute the corporation, and

2    the Government adamantly maintained that, notwithstanding its

3    vast resources, the FBI, et cetera, et cetera, et cetera, the

4    Government could not determine individuals who were complicit.

5    There's -- the concern in Barclays was that this corporation is

6    getting a free ride here, why isn't there someone going to jail?

7    Why doesn't someone have a record?  Why doesn't this -- why

8    doesn't this happen?  And the Government maintained it was

9    just -- notwithstanding its vast resources, they could not

10   determine the individuals -- who the individuals were.

11        But here it's not just the corporation, but we know -- you

12   know, we know who was paying the bribes.

13        MR. SEELEY:  Right.  And it was just one individual, but

14   we certainly know who it was.

15        THE COURT:  Yeah, right, exactly.

16        MR. SEELEY:  Yes.

17        THE COURT:  And I accept your representations that he was

18   forthcoming and probably told you more than you'd ever find out

19   through your own independent investigation, which must have been

20   very difficult given just the logistical issues.

21        But, it is troubling, and not only troubling in the sense

22   of those individuals in this case, but it's troubling insofar as

23   just looking at all the other individuals that come before the

24   Court.  I mean, just in my experience, my 30 years in the court,

25   people do all sorts of stupid things, and by and large I'm always

1    telling people at the time of sentencing you're not an inherently

2    a bad person, you just did something really stupid and dumb.  But

3    that person has that record that's going to haunt him or her for

4    the rest of their lives for having done something stupid, maybe

5    selling drugs, maybe some kid selling drugs to get some Michael

6    Jordan tennis shoes.  I don't want to blame it on Michael Jordan

7    or any star athletes' gear, let's just say gear.  Or someone else

8    doing something stupid or someone else who's lost his job and

9    can't support his family, he's got to sell drugs to support --

10   that person pleads guilty.  He may not go to jail, but that

11   person has, then, a felony conviction, and for all intents and

12   purposes, the doors are slammed shut when he or she tries to get

13   a job.  I mean, I think that's a funda- -- an aspect of

14   fundamental fairness that concerns the Court as well, so it's not

15   just these individuals, it's everyone else who comes before the

16   Court.  I have never presided over any case in which the Federal

17   Government has offered a deferred prosecution agreement to

18   someone accused of conspiring to possess with intent to

19   distribute drugs.  And I'm waiting for my clerks to correct me,

20   but I'm -- I'm pretty sure I haven't.  That type of agreement is

21   nonexistent before this Court, and, you know, the three courts

22   I've served.  And I'm not aware of any colleague who's had one of

23   those cases, so in those cases -- I mean, those cases really tuck

24   at the heart's strings whom someone is relegated to do something

25   of a criminal nature, sell drugs to support his family because

he's lost his job and he's got five kids, his wife's sick, can't

work, and now he has a felony conviction and won't ever be able

to get a job.  But the Government -- and I recognize it's an

executive branch decision and discretion to determine when to

enter into these Deferred Prosecution Agreements.  We don't see

them, though, with respect to John Q. Public and Jane Q. Public

who come before the Court day after day after day after day, more

often than not having done something really stupid.  That

concerns -- I can't speak for all my colleagues, but it concerns

me.  So should that factor into the decision whether the Court

should accept or reject?  The fact that this type of an agreement

for an individual -- and that's what it is here.  Sure, the

corporation is named, but it's a -- you know, it's another

sweetheart deal for this individual, one of thousands of people

who've appeared before the Court over the past 30 years.  Is that

fair?  And if it's not, should that factor into the Court's

decision of whether to accept it or not?

     MR. SEELEY:  I think that for the reasons I've previously

stated, Your Honor, I don't have a whole lot to add about why we

made the decision we made, but I think the resolution in this

case is fair.  It is not ideal.  If Saena Tech Corporation had

been based in Arlington, Virginia or in, you know, Northeast

D.C., I don't know that we'd be here talking about a DPA, you

know.  There are -- there were major logistical challenges here

with a wholly owned Korean corporation, a Korean national, no

```
1    ties to the U.S., and the need for cooperation and the need for
2    cooperation quickly.  And there is also the issue of someone who
3    came forward and spilled the beans, and without that we're not
4    here at all, so I think those are the two big -- and I know I've
5    already mentioned them, Your Honor, but I think those are the two
6    big things that make this resolution appropriate, whether it
7    is -- I mean, the word "fair" -- whether it is fair that --
8            THE COURT:  Is it consistent with the fair administration
9    of justice?
10           MR. SEELEY:  I think it is.
11           THE COURT:  Yeah.
12           MR. SEELEY:  Yeah, I think it is.  I mean, for someone to,
13   you know -- fair is just a hard -- whenever anyone commits a
14   crime, we want them, you know, to be punished, to punish them for
15   deterrent value and so other people don't do the same, but I
16   think there are elements --
17           THE COURT:  Or you wish to defer them as well.
18           MR. SEELEY:  Yes.
19           THE COURT:  I don't want to put words in your mouth,
20   but --
21           MR. SEELEY:  Yes.
22           THE COURT:  -- I mean, deterrence is part of the
23   prosecutor's fair role, too.
24           MR. SEELEY:  Absolutely.
25           THE COURT:  And sometimes, you know, we don't see these
```

1    agreements, but according to whether or not these agreements --

2    we should see more of these agreements because someone has owned

3    up to what he or she did, there was a legitimate reason, although

4    not acceptable by society, but someone screwed up, made a

5    mistake, but in all likelihood everyone agrees you'll never see

6    that person again in the criminal justice system.

7          MR. SEELEY:  Right.

8          THE COURT:  But according to whether or not that person

9    should be prosecuted, and they didn't have that intended criminal

10   record that's going to slam doors in his face when he tries to

11   get a job because he got a felony, or whether he should get the

12   benefit of one of these Deferred Prosecution Agreements, you

13   know, walk the straight and narrow for two years, and he'll never

14   have to say anything about this.

15         MR. SEELEY:  Right.  Oh, I think, you know, in every day

16   in our job at the U.S. Attorneys' Office we're exercising

17   discretion of this kind, whether it's myself and Mr. Atkinson

18   doing so with fraud and public corruption cases or the drug

19   prosecutors doing that.  And I prosecuted drug cases in Superior

20   Court for several years, and you do try to reach the outcome that

21   is fair.  Sometimes that does mean not charging someone so the

22   Court doesn't even end up seeing the case.

23         THE COURT:  And I have no doubt that happens, and

24   that's -- and that's fair that you bring that up.  I have no

25   doubt that it happens, and it should happen where people make

1    decisions we're not going to charge this person although we know

2    this person committed a crime.

3        MR. SEELEY:  Right.

4        THE COURT:  I'm sure it happens.

5        MR. SEELEY:  And the Attorney General has, in the last

6    couple of years, given us more discretion with regard to drug

7    cases as well, which I know our office has taken advantage of.

8        But I do think here we have tried, to use Your Honor's

9    words, to reach a resolution that is a fair administration of

10   justice.  It is not ideal, but it is a resolution I think that

11   the Court should approve, and we appreciate the Court's concerns

12   about it and it's helpful to talk about it, even from my

13   perspective, but as I talk about it more, you know, I do get -- I

14   do become more confident that this was the best resolution we

15   could reach here given the circumstances.

16       THE COURT:  Let me ask you this question, and then the

17   Court's going to take a very short recess.  If the Court -- would

18   there be objections to the Court proceeding with the colloquy --

19   and this is actually a question for Mr. Kim's attorneys as well,

20   and the Saena Tech's -- and that's another question that kind of

21   concerns the Court, that the attorney for Mr. Kim is also the

22   attorney for the corporation.  And I understand that there have

23   been waivers of conflicts of interest, et cetera, and I'll

24   probably -- as part of the colloquy, if we go forward this

25   morning, ask Mr. Kim as well, whether or not he waives any other

1    potential conflict of interest.

2         Are there objections to the Court going through the

3    colloquy, deferring the question of acceptance to another date?

4    I'm mindful that you have a firm trial date in September, and the

5    case is on track to be tried in September, correct?

6         MR. SEELEY:  Correct.

7         THE COURT:  All right.  I'm mindful of that, but are there

8    objections to a deferral of a decision to accept or approve the

9    deferred prosecution agreement to another date?  Because the

10   Court may appoint -- the Court may appoint someone, a third party

11   to address some of these issues because the Court cannot be an

12   advocate.  I can raise these issues, but I can't be an advocate.

13   I can't argue the other side.  I can administer justice and

14   decide controversies, but I can't and should not be the principal

15   advocate for legitimate concerns that the Court has raised.  But

16   according to whether or not the Court should appoint someone who

17   should at least advocate on those issues, it may well be that

18   fairness is not something the Court should consider in the

19   context of approving or disapproving a deferred prosecution

20   agreement.

21        The question, though, simply is:  Are there objections to

22   going through this colloquy, deferring the question of acceptance

23   or rejection to another date, well in advance of the trial date,

24   and to give the third person an opportunity to weigh in to

25   address the Court's concerns, if the Court decides either today

1  or later to appoint someone?

2       MR. SEELEY:  There is no objection to proceeding in that

3  manner, to going through the colloquy today.  I know that, you

4  know, Mr. Kim and his wife have come here from Korea, as well as

5  his attorney, and so I think it would be the most -- I'll let

6  them speak for themselves, but I think it would be the most

7  efficient use of their time --

8       THE COURT:  All right.

9       MR. SEELEY:  -- to do that.

10       THE COURT:  But you raise another question.  Let's

11  assume -- and just hypothetically, don't read anything into this,

12  but if the Court were at the end of the day to reject the plea

13  agreement, what he says under oath today could not be used

14  against him, I assume, correct, or could it?  He's not been

15  immunized.

16       MR. SEELEY:  If I could -- I just want to make sure I read

17  the agreement before I -- read that portion of the agreement

18  closely, if I could just defer it until a little later.

19       THE COURT:  Because that was a concern the Court had, and

20  it was kind of open-ended, I thought, too.

21       MR. SEELEY:  Yeah.

22       THE COURT:  So I don't want him to stand here and raise

23  his right hand and swear to tell the truth about certain things

24  and inculpate himself under oath and the Court reject it.  And

25  again, don't read that into it, but I have to --

1        MR. SEELEY:  Right.

2        THE COURT:  Form my vantage point I have to raise it at

3  least, because I don't want someone to testify under oath and

4  then the Government have an opportunity to prosecute that person

5  later.

6        MR. SEELEY:  Right.  I'd just like to take a look at the

7  agreement on that.

8        THE COURT:  Sure.

9        MR. SEELEY:  If I could just say something about the

10 Court's potential idea for appointing another person to look at

11 this.  I do think, you know, issues related to Deferred

12 Prosecution Agreements are gaining more notice in our office, so

13 I think our office is still sort of developing what our position

14 is on that.

15       THE COURT:  Does that mean we're going to see more with

16 respect to individuals?

17       MR. SEELEY:  No, not that I'm aware of.  I'm more --

18       THE COURT:  I see your head shaking to the left and right

19 out there, so...

20       MR. SEELEY:  I more mean the legal issues, the legal

21 issues.

22       THE COURT:  Right.

23       MR. SEELEY:  So as I said, I believe our office's position

24 is that, you know, the Court's role here is really the procedural

25 rights, the speedy trial, and not, you know, is this DPA fair to

1   the public or not.  Ultimately that -- the discretion there lies

2   with the executive branch, and so I don't -- given that position,

3   I don't think it's appropriate to appoint someone else to look at

4   this.

5        THE COURT:  All right.

6        MR. SEELEY:  Even if the Court disagrees and finds the

7   Court has inherent authority to determine whether this is fair or

8   not as part of its decision whether to go forward -- which we

9   argue the Court should not and does not -- I'm simply giving the

10   Court the reasons why --

11       THE COURT:  Sure.

12       MR. SEELEY:  -- Your Honor should agree with us that --

13       THE COURT:  I appreciate that.

14       MR. SEELEY:  -- that is fair.

15       THE COURT:  I appreciate that.

16       MR. SEELEY:  But I just wanted to make sure our position

17   is clear.

18       THE COURT:  No, it's clear, and I appreciate your answers.

19       MR. SEELEY:  Okay.

20       THE COURT:  Can I get the -- where's that HSBC case?  And

21   I'm going to give you a few minutes to take a look at the

22   agreement also regarding immunity, regarding the question I

23   posed.

24       MR. SEELEY:  Yeah, I will try to get answers to those two

25   questions right now.

1          THE COURT:  Okay.  Okay.  All right.

2          Let me ask Mr. Kim's attorney -- do you want to --

3     actually, I'm not going to require you to say anything until the

4     Government has spoken, but I want your position also with respect

5     to proceeding, not formally accepting, deferring until another

6     day.  I don't know if I'm going to appoint someone or not.  I may

7     not.  Do you want to weigh in now on that?

8          MR. BRIZEK:  Perhaps I could speak with co-counsel during

9     the break and --

10         THE COURT:  Absolutely, I'll do that.  All right.  In

11    fact, you can talk to Government counsel if you'd like to.

12         MR. BRIZEK:  Okay.

13         THE COURT:  There's no need to stand.  The Court will take

14    a short recess.  All right.  Thank you very much for your

15    answers, Counsel.  I appreciate them.

16         MR. BRIZEK:  Thank you.

17         THE COURT:  Sure.

18         (Thereupon, a break was had from 10:34 a.m. until

19    11:16 a.m.)

20         THE COURT:  All right.  I took another look at the

21    agreement as well over the recess, and I didn't see any language

22    in the agreement that addresses the scenario that we were talking

23    about; in other words, if the Court were to hypothetically --

24    I'll emphasize that -- reject the deferred prosecution agreement,

25    what would the -- what would the impact of that decision have on

1    the in-court under oath testimony given by corporate

2    representatives and Mr. Kim.  I didn't see anything in there.  It

3    doesn't mean that the parties can't amend it, but I just didn't

4    see anything, unless I overlooked it.  I don't know.

5         MR. SEELEY:  There's nothing in there that specific, Your

6    Honor, but I think the operative paragraph is paragraph 14 on

7    page 9.  And the gist of that paragraph is that statements made

8    in court, like the ones in any colloquy, could not be used

9    against anyone except if there's a breach of the agreement.

10        THE COURT:  If they're in breach, but that -- if the Court

11   decided after hearing his in-court testimony under oath, though,

12   that the Court was going to reject it, that's the scenario that

13   the Court was concerned about, not that he's done anything to

14   breach or that any other corporate officer --

15        MR. SEELEY:  Right, but I think that by the terms of the

16   agreement itself, it's not contingent.  The agreement itself is

17   not contingent on the Court's approval, so I think by the terms

18   of the contract --

19        THE COURT:  Well, why are you here, then?  It gets back to

20   the Court's role.

21        MR. SEELEY:  Right, and what I said before, there are

22   several reasons we're here, Your Honor.  I mean, we're here

23   because we filed an information as part of this.

24        THE COURT:  Right, and it is a prosecution, a current

25   prosecution that's pending with the filed information, right.

1      MR. SEELEY:  Right.  We filed information in front of this

2  Court.  It's a related case to other cases with this Court.

3  We're asking the Court -- we're here to ask the Court for rulings

4  on, you know, a waiver of indictment and whether it's knowing and

5  voluntary; a waiver of speedy trial, whether it's knowing and

6  voluntary; whether these individuals, in the Court's view, have

7  the power to bind the company; and whether the Speedy Trial Act

8  will be excluded.  That's why we're here.  And the Court plays --

9  and, you know, I'm not belittling the Court's role.  It's a very

10  important role, and we -- we're here to ask the Court to do those

11  things.

12      But I just -- to finish with this question, I think that

13  regardless of what the Court did here, I think by the terms of

14  this agreement we could not use these against the defendant

15  unless there's a breach of the agreement, which the Court's

16  rejection of the agreement would not be a breach by the

17  defendant.

18      THE COURT:  All right.  All right.  Fair enough.  Let

19  me -- let me just say this.  We were able to find -- the judge in

20  New York was actually Judge Gleeson who actually issued a 20-page

21  opinion and order.  It's not published.  It should have been.  I

22  think it's excellent, it's well-written, extremely well-written.

23  But it appears on the docket, correct?  Yeah.  Well, we have

24  copies.  I'm not going to hide the ball from you.  We have

25  copies, two copies, we'll be happy to give the parties.

1          But the Court is going to appoint someone to address the

2     issues that the Court has alluded to, and we can talk about a

3     time frame.  I'm sensitive to the fact that a colleague in

4     Virginia, I don't even know who the colleague is, and it makes no

5     difference, but I'm sensitive to the fact that a colleague in

6     Virginia has scheduled a firm trial date in September -- and

7     that's September the 23rd; is that correct?

8          MR. SEELEY:  That's correct, Your Honor.

9          THE COURT:  September 23rd.

10         MR. SEELEY:  Your Honor, I'm prosecuting the case as

11    Special AUSA up there.  It's in front of Judge Brinkema.

12         THE COURT:  Right.  And I'm sensitive to the fact that

13    there is a firm trial date.  I'm also sensitive to the fact that

14    the Court -- and the Court was ready to proceed with this matter

15    earlier this year, and at least had scheduled a hearing in June,

16    but it had had preliminary -- not in-person discussions, but it

17    had issued orders earlier than June setting forth the parameters

18    for this proceeding.  So I'm not going do anything to unduly

19    delay this proceeding, but I do want some answers to legitimate

20    questions that the Court has, so the Court will appoint

21    someone -- the Court will issue an order and direct the

22    Government to address these issues and defense counsel first.

23    And I'll probably appoint an amicus, I'm not sure who, to respond

24    to the Government's submission.  And then the Court will, in all

25    likelihood, have another hearing, the purpose of which will be to

1    determine whether the Court should finally accept the proposed

2    deferred prosecution agreement.

3         So, so there's no misunderstanding -- I recognize one of

4    the interpreters has to leave at noon, so we'll utilize the

5    services of that interpreter until noon.  I have some other

6    matters and we'll get to those matters when we get to them.

7         But so there's no misunderstanding, what the Court is

8    prepared to do, unless there are objections by any corporate

9    officer and/or Mr. Kim's corporate -- Mr. Kim's a corporate

10   officer as well; is that correct, or not, former corporate

11   officer?

12        MR. BRIZEK:  Your Honor, Mr. Kim is one of the directors

13   and he's the managing director.

14        THE COURT:  All right, managing director.  Unless there

15   are objections by anyone, the Court will proceed to take the

16   in-court testimony under oath.  We'll defer a decision on

17   acceptance or rejection of the deferred prosecution agreement.

18   We'll put in place an expedited briefing schedule for the

19   questions the Court has raised, and then we'll schedule another

20   hearing, in all likelihood, probably -- it won't be until after

21   Labor Day, but it will be in advance of the trial date that's

22   been scheduled before my colleague in the Eastern District.

23        Unless there are objections by anyone to proceed -- are

24   there any objections on behalf of the corporate officials and/or

25   Mr. Kim to proceeding?  And I'm going to say it's an open

1    question, I think, as to whether the -- as to what will happen

2    should the in-court sworn testimony in the event that the Court

3    rejects the plea agreement.  And again, don't read anything into

4    it.  I'm raising the question, but I have to raise it.  There

5    could be a scenario where the Court could reject the plea

6    agreement, and what then becomes of the in-court testimony under

7    oath?  That issue's not addressed by the plea agreement.  The

8    Government has represented that it could not use information

9    against Mr. Kim and/or the corporation unless there were a breach

10   of the plea agreement.  That may well be the case, but as part of

11   this process today, and if the witnesses are going to testify

12   agree to that, they'll have to agree that it's not in the

13   agreement, that's their understanding as to what the Government

14   can or will do, but it's certainly not in a plea agreement and

15   the Court is not expressing any opinion about future use of that

16   evidence.

17          So do you want proceed along those lines or not?

18          MR. BRIZEK:  Your Honor, on behalf of Mr. Kim and the

19   corporation, we have no objection to proceeding.  And just to be

20   clear, there's no plea agreement contemplated here, it is the

21   deferred prosecution agreement, and I think that puts it in a

22   slightly different context in terms of the Court's --

23          THE COURT:  If I mentioned plea agreement I meant deferred

24   prosecution agreement.

25          MR. BRIZEK:  Thank you.

1          THE COURT:  All right.  All right.  Let's proceed with

2     the -- Counsel, do you wish to say anything before we proceed?

3     Do you wish to put anything on the record?

4          MR. SEELEY:  Yes, Your Honor, just with regard to

5     appointing an advocate, Your Honor, we would -- I'm not going to

6     belabor this.  We would ask the Court to reconsider.  And if I

7     could just say a couple of things on that.  It's not clear to me,

8     I guess, of what the Court wants the independent advocate to look

9     at, but I can think of at least three things.  One is whether

10    there's -- this is fair to the public, which I think is the issue

11    in most DPAs involving large companies like HSBC, and I assume

12    that was the issue at the -- that Judge Gleeson ruled on.  We

13    don't think that is appropriate.  We don't think that is part of

14    the Court's role here.

15         The second is whether --

16         THE COURT:  You may be absolutely correct at the end of

17    the day, I just don't know.

18         MR. SEELEY:  Right.

19         THE COURT:  And there's a dearth of authority out there.

20         The other issue would be the authority of the Court to

21    reject.  What authority does the Court have to reject a deferred

22    prosecution agreement, and for what reasons?

23         MR. SEELEY:  Right.

24         THE COURT:  And that's -- it's not clear what that

25    authority is.

1        MR. SEELEY:  So that was the third issue.  If that's the

2   issue, Your Honor, we are happy.  And it sounds like the Court is

3   going to ask us to submit something, and we're absolutely happy

4   to do that.

5        THE COURT:  Absolutely, in the first instance.

6        MR. SEELEY:  If the Court wants just sort of an

7   independent party on the other side to play devil's advocate or

8   something, I think we have less problem with that.  If it's

9   really just about the Court's authority, you know, we can lay --

10       THE COURT:  That's the principle recently:  What's the

11  Court's authority?  I mean, because as Judge Gleeson stated, and

12  as the Court was about to say, as Brendan Sullivan eloquently

13  stated years ago, you know, we're not just potted plants sitting

14  up here.

15       MR. SEELEY:  Of course not.

16       THE COURT:  And I understand the Government's

17  representations that it may well be that the Court's role is

18  limited to ensuring that procedural due process is afforded the

19  individuals.  And I don't want to misquote you, but that's

20  essentially what --

21       MR. SEELEY:  That's generally what we're saying, yeah.

22       THE COURT:  Right.  I think it would be good -- I may

23  ultimately write on this subject because there' a dearth of

24  authority out there, but judges should meet and should know just

25  what their authority is when they're confronted with these

1   Deferred Prosecution Agreements because, as you indicated, there

2   are more of these appearing in courthouses.  We don't see as

3   much of -- we don't see as many of them for the street crimes,

4   and arguably there should be more of those, but that's the

5   executive branch's decision.  But they're appearing more often in

6   courthouses, and it may well be that this is a topic that should

7   be addressed in writing by this Court.

8        But those are the two principal topics:  Fundamental

9   fairness of these agreements, vis-à-vis other participants in

10  this case, all of whom have gone to jail with the exception

11  of the real estate broker, Ms. Woo.

12       MR. SEELEY:  Ms. Woo.

13       THE COURT:  And, you know, that woman was -- she has a

14  misdemeanor conviction for the rest of her career, and she's a

15  licensed real estate broker.  And, you know, I mean, you know,

16  her involvement, her culpability was the least of anyone, I

17  think, wouldn't you agree with that?

18       MR. SEELEY:  Of the defendants who've come before the

19  Court?

20       THE COURT:  Yeah.

21       MR. SEELEY:  I would agree with that.

22       THE COURT:  Yeah.  Yeah.  I recall her crying.  I mean,

23  she should be crying.  She's got to report that every time she

24  renews her license.

25       MR. SEELEY:  I will say, though, that, Your Honor, there

 1    are other people in the case that have not come before the Court

 2    because a decision was made not to prosecute.

 3            THE COURT:  That's a very good point, and I'm not going to

 4    loose site of that, right.

 5            MR. SEELEY:  But in terms of the -- as I understand the

 6    Court's concern about fundamental fairness, it is less

 7    fundamental fairness to do this good for the public.  It is about

 8    fundamental fairness of this disposition, vis-à-vis the other

 9    defendants in this case, and no one is in a better position than

10    Your Honor to determine that.  There is no need for an

11    independent monitor.  Your Honor has been here and is familiar

12    with all these defendants.  All these defendants have come before

13    the Court and have pled guilty and have been sentenced.

14            THE COURT:  Right.

15            MR. SEELEY:  So if the idea is that, you know, the

16    independent person looks at the case law and the authority, you

17    know, I don't think we have a strong objection in that, but --

18            THE COURT:  No, that was the only reason.  I mean, I don't

19    know -- and again, I can't be an advocate.  I'd be a hell of an

20    advocate, but I can't.  You know, I can't do the research and --

21    I mean, we'll do some independent research, but I should not be

22    taking the other side of the issue, and, of course, I should not

23    be putting myself in the position of being an advocate.  I raised

24    the issue.  There may well be there's a ton of authority out

25    there that says questions of fairness in this type of proceeding

1   are not the concern of the Court.  I don't know.

2         MR. SEELEY:  Right.

3         THE COURT:  Or by analogy, maybe that argument can be

4   made, I just don't know, but I feel uncomfortable.  You've done

5   some initial research.  You've found this opinion.  Thank you for

6   the case site, for the docket site, and in return we gave

7   everyone a copy of this opinion.  I think it's well written.  I

8   don't know why Judge Gleeson didn't publish it.  I'm going to

9   call him and ask him to publish it.  I think there's some

10  guidance out there that should be shared with his colleagues.

11        Now, but and you mentioned advocate.  I'm going to appoint

12  someone to address the issues.  You can call them an advocate, an

13  amicus or whatever, but I'm not going to delay this proceeding at

14  all.

15        MR. SEELEY:  No, and --

16        THE COURT:  I'm mindful that we have a firm trial date.

17        MR. SEELEY:  -- I very much appreciate that.  I guess my

18  main point, Your Honor, is we don't think the advocate should be

19  weighing in on whether this deal was fair.  We think if anyone is

20  going to weigh in on that it should be the Court.

21        THE COURT:  Right.  Well, the advocate would probably

22  weigh in on the legal issue of what weight, if any, should the

23  Court give to the issue of fairness, vis-à-vis other defendants,

24  vis-a-vis the concept of the fair administration of justice.  So,

25  I mean, I think he or she can talk on the abstract on that.

1          MR. SEELEY:  Okay.

2          THE COURT:  All right.

3          MR. SEELEY:  Thank you, Your Honor.

4          THE COURT:  Thank you very much, Counsel.

5          All right.  Do you want to proceed -- are you ready to

6     proceed, Counsel?

7          MR. BRIZEK:  Yes.

8          THE COURT:  With respect to this proceeding, do you want

9     to put anything on the record?  We have a deferred prosecution

10    agreement.  We're an hour and a half afterwards, but was there a

11    preamble that you wanted to put on the record about Mr. Kim

12    and/or the corporate representative who have testify?

13         MR. SEELEY:  I think I've addressed the things that I

14    would have said in the discussions with Your Honor.

15         THE COURT:  All right.  All right.

16         Counsel, would you come forward with your client.

17         MR. BRIZEK:  Judge, may I just inquire of the Court

18    whether the Court wishes to hear from the chief executive officer

19    or Mr. Kim as the operations officer or director?

20         THE COURT:  I want to hear from both of them.  Chief

21    executive officer first.  Do you represent her as well?

22         MR. BRIZEK:  I represent the corporation together with

23    Mr. Noh who's present.

24         THE COURT:  All right.  And she's testifying on behalf of

25    the corporation?

1    MR. BRIZEK:  Yes.

2    THE COURT:  I'm asking -- I'm going to ask her questions

3  about the authority to bind the corporation with this deferred

4  prosecution agreement.

5    MR. BRIZEK:  Yes, Your Honor.

6    THE COURT:  And she's prepared to answer those questions?

7    MR. BRIZEK:  Yes, sir.

8    THE COURT:  All right.  Do you need an interpreter?

9    MR. BRIZEK:  She's using one right now.

10    THE COURT:  All right.  I'll ask the deputy clerk to

11  administer the oath, then.

12        (MI KYOUNG LEE, WITNESS IN THE CASE, SWORN)

13    MS. LEE:  I do.

14    THE COURT:  It's very important that we have a clear

15  record here.  All right.  I'm going to -- first of all, good

16  morning, ma'am.  Good morning.  All right.  And what's your name?

17    MS. LEE:  My name is Mi Kyoung Lee.

18    THE COURT:  All right.  And what's your relationship to

19  Saena Tech Corporation?

20    MS. LEE:  I am representing the managing director of the

21  Saena Tech Corporation.

22    THE COURT:  All right.  And why are you in court today?

23    MS. LEE:  I came here to admit the wrongdoings that we

24  have done, and then if there was any questions, to answer the

25  questions.

1          THE COURT:  All right.  My understanding is that the

2     corporation has entered into what we call a deferred prosecution

3     agreement with the Government.  Is that your understanding?

4          MS. LEE:  Yes, I do.

5          THE COURT:  All right.  And do you have the authority,

6     pursuant to corporate activity, to bind the corporation with

7     respect to this third party -- with respect to this deferred

8     prosecution agreement?

9          MS. LEE:  Yes, I do.

10          THE COURT:  All right.  And what confers that authority on

11     you?  Is there a document that confers that or are there

12     corporate minutes that confer that?

13          MS. LEE:  My understanding is that DPA is to admit our

14     wrongdoings and pay the fines and to open directors' meeting to

15     discuss future actions and to prepare for any future actions and

16     also to cooperate with the investigation by the United States.

17          THE COURT:  All right.  And I'm not an expert with respect

18     to the Korean Commercial Act, but my understanding is that law

19     enables the corporation to approve the resolution authorizing you

20     and Mr. Kim to sign the deferred prosecution agreement; is that

21     correct?

22          MS. LEE:  Yes.  Yes, we did.

23          THE COURT:  All right.  Do you have a copy of the deferred

24     prosecution agreement in front of you.

25          MS. LEE:  Yes.

1          THE COURT:  All right.  Have you personally read the

2    agreement?

3          MS. LEE:  Yes, I did read it.

4          THE COURT:  All right.  Does your signature appear at any

5    place on that document?

6          MS. LEE:  Yes.  There is my signature.

7          THE COURT:  Where?

8          MR. BRIZEK:  Judge, may counsel assist to get to the right

9    page?

10         MS. LEE:  It's on page 13.

11         THE COURT:  Page 13?

12         MS. LEE:  Page 13.

13         THE COURT:  And you signed as chief executive officer of

14   the corporation, correct?

15         MS. LEE:  Yes, I did.

16         THE COURT:  All right.  And does your signature appear

17   elsewhere in that document?

18         MS. LEE:  Yes, there is.  It's on page 15.

19         THE COURT:  All right.  I see.  All right.  Let me ask

20   you:  And that's the company officer certificate, correct, on

21   page 15?  When you signed your name on page 15, you were signing

22   in your capacity as chief executive officer and you were

23   certifying certain facts, correct?

24         MS. LEE:  Yes, that is correct.

25         THE COURT:  And, indeed, by signing that document on

1    page 15, you certified that you had read it and carefully

2    reviewed every part of it with outside counsel for Saena Tech

3    Corporation, correct?

4          MS. LEE:  Yes, it does.

5          THE COURT:  And you also certified that you had carefully

6    reviewed the terms of the agreement with the board of directors

7    of the company, correct?

8          MS. LEE:  Yes.

9          THE COURT:  And you also certified that you are the chief

10   executive officer and that you had been duly authorized by the

11   company to execute or sign the agreement on behalf of the

12   company, correct?

13         MS. LEE:  Yes, it does.

14         THE COURT:  And Mr. Noh, who's present, correct, you

15   actually also signed the document on page -- I guess that would

16   be page 16, the follow page, correct, as counsel for the

17   corporation?

18         MR. NOH:  (Nodded head affirmatively.)

19         THE COURT:  Now let me ask you this:  What's your level of

20   education?

21         MS. LEE:  I have graduated high school.

22         THE COURT:  All right.  Did you read the deferred

23   prosecution agreement that was translated into your native

24   language?

25         MS. LEE:  Yes.  Yes, I did.

1    THE COURT:  Did you sign these documents before you read

2  them or after you read them?

3    MS. LEE:  After I read the agreement.

4    THE COURT:  All right.  Do you have any -- do you

5  understand the documents that you've signed?

6    MS. LEE:  Yes, I do understand.

7    THE COURT:  Do you have any questions about the documents?

8    MS. LEE:  I do not have any questions.

9    THE COURT:  All right.  Do you have any questions you want

10  to ask me about this proceeding or why you're in court today?

11    MS. LEE:  I do not have any questions.

12    THE COURT:  It appears that your signature is also on

13  page B2 of the statement of facts that's Attachment A of the

14  agreement; is that correct?

15    MS. LEE:  That is correct.

16    THE COURT:  All right.  Did you sign that document before

17  you read it or after you read it?

18    MS. LEE:  After I read it.

19    THE COURT:  Do you understand it?

20    MS. LEE:  Yes, I do.

21    THE COURT:  Before you signed it, did you understand it?

22    MS. LEE:  Yes, I did.

23    THE COURT:  All right.  And those are the statements of

24  the relevant individuals and entities.  Do you understand that?

25    MS. LEE:  Yes, I did.

```
1          THE COURT:  It's what the corporation says that the

2     corporation did and what Mr. Kim did.  Do you understand that?

3          MS. LEE:  Yes, I did.

4          THE COURT:  All right.  Is the statement of facts true?

5          MS. LEE:  It is true.

6          THE COURT:  All right.  I'm not going to go through each

7     and every paragraph.  I will note, though, that there are six

8     pages of this statement of facts, and you've read each and every

9     word, correct?

10         MS. LEE:  Yes, I did read it.

11         THE COURT:  All right.  The first section on page A1

12    addresses the relevant individuals and entities, and it carries

13    over to pages 2 and 3.

14         MS. LEE:  Yes.

15         MR. BRIZEK:  Judge, just as a matter of mechanics, forgive

16    me, but Ms. Lee is working off of the Korean translation.

17    There's also the English version which is on the screen here, so

18    the pagination from the Clerk's Office and what the Court refers

19    to may not correspond.

20         THE COURT:  Well, I'm going to preface all my questions

21    are referring to the English version, since I would have

22    absolutely no way of knowing where certain language appears on

23    the Korean version.

24         So with respect to the English version of the document,

25    pages 1 through 3 address the relevant individuals and entities.
```

1    Is that easier for the witness if I do that?

2         MR. NOH:  Your Honor, I can help her with the match of the

3    Korean --

4         THE COURT:  I'm sorry?

5         MR. NOH:  I will try to help her with the American version

6    with the Korean version, so --

7         THE COURT:  Well, tell me how to do it easier.

8         MR. NOH:  Just go ahead.

9         THE COURT:  All right.  That way?

10        MR. NOH:  Yes.

11        THE COURT:  Okay.  So is your answer yes?  She probably

12   doesn't know the question.  All right.

13        I'm looking at the English version of Attachment A and the

14   first subsection addresses relevant individuals and entities, and

15   there are ten entries.  Is everything true in those entries, in

16   those ten paragraphs?

17        MS. LEE:  Yes, it is true.

18        THE COURT:  All right.  Paragraphs Number 11 through 20

19   address things of value provided to Public Official C by Saena

20   Tech.  Do you see that on page A3?

21        MS. LEE:  Yes, yes.

22        THE COURT:  All right.  And this is very important.  Look

23   it over.  And you signed it, and by signing it you've said that

24   the things of value provided to Public Official C by Saena Tech

25   are set forth in Paragraphs Number 11 through 20, correct?

1          MS. LEE:  Yes, yes.

2          THE COURT:  All right.  So everything is true in those

3     paragraphs, correct?

4          MS. LEE:  Yes, that's true.

5          THE COURT:  And you've read every word prior to signing

6     it, and you understood what was set forth in paragraphs 11

7     through 20 before you signed that document, correct?

8          MS. LEE:  Yes, I did read it.

9          THE COURT:  All right.  And getting back to the deferred

10    prosecution agreement for a moment, do you understand that the

11    company has agreed to pay a monetary penalty in the amount of

12    $500,000 to the treasury within ten days of the filing of the

13    information?  I assume the $500,000 has been paid; is that

14    correct?

15         MS. LEE:  Yes.  Yes, we sent it.

16         THE COURT:  I'm going to make an assumption I probably

17    shouldn't.

18         MR. SEELEY:  I thought there was a -- sounded like

19    something cut off in the headphone there for a second.

20         THE COURT:  Well, the agreement provides that the 500,000

21    was to be paid within five -- within ten days of the filing of

22    the information.  I made an assumption it's been paid, but I

23    probably shouldn't assume that.

24         MR. SEELEY:  It was paid in April, Your Honor.

25         THE COURT:  It was paid in April?  All right.  Okay.

1              And that money is nonrefundable.  Do you understand that?

2              MS. LEE:  Yes, I understand.

3              THE COURT:  All right.  There are certain conditions for

4     this deferred prosecution agreement; in other words, the

5     Government has agreed not to prosecute the corporation in

6     exchange for payment of the $500,000 and certain other things

7     that the corporation has to do; is that right?  Is that your

8     understanding?

9              MS. LEE:  So are you asking what our corporation needs to

10    do?

11             THE COURT:  No.  I'm just asking if she understands that

12    the corporation has to not only pay $500,000, but it also has

13    agreed to do certain other things to keep from being prosecuted?

14    Do you understand that?

15             Take a look at page 6 of the deferred prosecution

16    agreement and tell me if you understand what's required of the

17    corporation or not.

18             MS. LEE:  Yes, understood.

19             THE COURT:  And page 7, there's also a corporate

20    compliance program that the company has to implement in and

21    ethics program designed to prevent and detect violations of

22    anti-corruption laws throughout its operations.  And that's set

23    forth in pages 7 -- on page 7.  Do you understand that?

24             MS. LEE:  Yes, I understand.

25             THE COURT:  And if the -- if the corporation does those

1    things, the Government has agreed not to prosecute it for the

2    criminal activity of the corporation as well as Mr. Kim.  Do you

3    understand that?

4           MS. LEE:  Yes, I understand.

5           THE COURT:  All right.  But if the corporation fails to

6    enact this corporate compliance program and if it fails to abide

7    by the terms set forth on page 6 of the deferred prosecution

8    agreement, the Government could prosecute the corporation.  Do

9    you understand that?

10          MS. LEE:  Yes, I understand.

11          THE COURT:  Do you understand this deferred prosecution

12   agreement will remain in effect for two years from the date that

13   it's approved by the Court?

14          MS. LEE:  Yes, I understand.

15          MR. SEELEY:  Your Honor, I'm sorry, if I could interrupt.

16          THE COURT:  Yes.

17          MR. SEELEY:  By the terms of the agreement, the term of

18   the deferred prosecution agreement actually starts running at the

19   filing of the information.

20          THE COURT:  All right.  In April?

21          MR. SEELEY:  Yeah.

22          THE COURT:  All right.  That's fine.  Thank you.

23          MR. SEELEY:  It's March 4th, actually.

24          THE COURT:  In March?  All right.  That's fine.

25          And the Court will in all likelihood schedule interim

1   status hearings to determine whether or not the corporation is

2   complying with its obligations.  The Court will in all likelihood

3   schedule one or two status hearings six months apart to determine

4   compliance.  Do you understand that?

5        MS. LEE:  It's understood.

6        THE COURT:  And you'll have to attend those status

7   hearings.  Do you understand that?

8        MS. LEE:  Yes, understood.

9        THE COURT:  All right.  There's a section that is

10  addressed breach of the agreement, the bottom of page 8 of the

11  deferred prosecution agreement.  Do you see that?

12       MS. LEE:  Yes, I see it.

13       THE COURT:  All right.  Did you read that section before

14  you signed the deferred prosecution agreement?

15       MS. LEE:  Yes, I have read it.

16       THE COURT:  All right.  And that section that sets forth

17  the things that could happen in the event that the corporation

18  breaches the deferred prosecution agreement, do you understand

19  that?

20       MS. LEE:  Yes, understood.

21       THE COURT:  Do you have any questions about what the

22  Government can do in the event of a breach of the agreement?

23       MS. LEE:  Yes, I understand.

24       THE COURT:  Do you have any questions about what the

25  Government can do in the event the corporation breaches the plea

1    agreement?

2          MS. LEE:  Yes.

3          THE COURT:  You said yes, so what are your questions?

4          MR. NOH:  She misunderstood.

5          THE COURT:  I can't make the question any clearer.

6          If there's a breach of the plea agreement, if the

7    corporation fails to perform, fails to live up to its obligations

8    under this plea agreement, there are some terrible things that

9    could happen to the corporation.  Do you understand that?

10         MS. LEE:  Yes, understood.

11         THE COURT:  All right.  And they're set forth -- this is

12   the English version, but point her to the Korean version as well.

13   It's set forth on page 8 of the English version on page 9 of the

14   English version and carries over to page 10.  The Government can

15   prosecute the corporation.  Do you understand that?

16         MS. LEE:  Yes, I understand.

17         THE COURT:  The Government can use any evidence that

18   you've provided to the Government against the corporation, any

19   statements that you've provided in your capacity as corporate

20   official.  Do you understand that?

21         MS. LEE:  Yes, understood.

22         THE COURT:  All right.  And if the Government believes

23   that you breached the plea agreement, the Government's going to

24   first notify you that it thinks you've breached the plea

25   agreement before it prosecutes you, and if you can't cure the

1    breach the Government's going prosecute the corporation.  Do you

2    understand that?

3              MS. LEE:  Yes, understood.

4              THE COURT:  Do you have any questions about that, what

5    could happen?

6              MS. LEE:  I do not have any questions.

7              THE COURT:  And in your capacity -- I don't to misspeak,

8    but in her capacity as corporate official she's going to testify.

9    She's an intended witness, proposed witness in the Virginia

10   proceeding, I assume, or not?

11             MR. SEELEY:  We do not intend to call her.

12             THE COURT:  You don't call her?  Okay.

13             MR. SEELEY:  We do intend to call Mr. Kim.

14             THE COURT:  All right.  Okay.  Could she be called by

15   someone else?

16             MR. SEELEY:  I mean, I don't expect she would be called to

17   testify.

18             THE COURT:  All right.  All right.

19             MR. SEELEY:  I don't have any reason to believe this

20   individual was involved in the criminal activity.

21             THE COURT:  All right.

22             MR. SEELEY:  I think it was Mr. Kim exclusively, from what

23   we know.

24             THE COURT:  All right.  In the event the corporation is

25   sold before the expiration of two years, you have to give notice

1    that this deferred prosecution agreement exists to a prospective

2    purchaser.  Do you understand that?

3            MS. LEE:  Yes, I understand.

4            THE COURT:  Now, also, there's an obligation that the

5    corporation has not to make any public statements that contradict

6    this deferred prosecution agreement.  Do you understand that?

7    That's on page 10 of the English version.

8            MS. LEE:  Yes, understood.

9            THE COURT:  All right.  And that's consistent with the

10   corporation accepting responsibility for its criminal behavior.

11   Do you understand that?

12           MS. LEE:  Understood.

13           THE COURT:  All right.  Now, this agreement sets forth all

14   the terms between the corporation and the United States

15   Government; is that right?

16           MS. LEE:  That's correct.

17           THE COURT:  There are no other provisions that you're

18   aware of then, correct?

19           MS. LEE:  Yes.

20           THE COURT:  All right.  And you're asking me in your

21   capacity as an officer of the corporation to approve this

22   agreement, then, correct?

23           MS. LEE:  Yes, that's correct.

24           THE COURT:  All right.  And as I indicated earlier I'm

25   going to take it under advisement.  I'm going to appoint someone

1    to address the legal issues that the Court has raised, and so

2    approval will not happen today, but it'll -- if it's going to

3    happen at all, it'll be hopefully prior to the trial date in

4    Virginia.  Do you understand that?

5           MS. LEE:  Yes.

6           THE COURT:  So you may have to come back -- in fact, you

7    will have to come back to court.  The date's uncertain at that

8    point, but --

9           MS. LEE:  Yes, understood.

10          THE COURT:  -- I'm not going to have a long delay for

11   resolution of this issue.

12          Do you have any questions about anything?

13          MS. LEE:  No, I don't.

14          THE COURT:  All right.  Are you still asking the Court to

15   approve this agreement in your capacity as an officer of the

16   corporation?

17          MS. LEE:  Yes.

18          THE COURT:  And you're aware of the criminal involvement

19   of the corporation as well as Mr. Kim, correct?

20          MS. LEE:  Yes, understood.

21          THE COURT:  All right.  I don't have any other questions.

22   Is there anything that the Government wishes me to ask in other

23   questions as part of the colloquy?

24          MR. SEELEY:  We would just ask Your Honor to address

25   whether the waivers, the two waivers of indictment and speedy

1    trial, are knowing and voluntary.  Hopefully the Court has those

2    documents and they'll be passed up.

3         THE COURT:  Good points.  All right.

4         All right.  There are three waivers I want to ask you

5    about.  All right.  The corporation and Mr. Kim have the same

6    attorney; is that correct?

7         MS. LEE:  Yes, correct.

8         THE COURT:  All right.  I'm not suggesting at all that

9    there are any conflicts in interest, but if there were, my

10   understanding is that the corporation has agreed to waive any

11   conflict of interest with Mr. Kim in agreeing to have the same

12   attorney; is that correct?

13        MS. LEE:  Yes, correct.

14        THE COURT:  All right.  Do you understand the question?

15        MS. LEE:  Yes, I do understand.

16        THE COURT:  All right.  The corporation has also agreed to

17   waive an indictment, and information was filed with the Court.

18   And let me -- I should read that information to you.

19        Actually, do you have a copy of the information?  I'm not

20   going to read it.  Why don't you show her a copy of the

21   information that you have, Counsel.  Do you see it?

22        MR. NOH:  Yes, I see an exhibit.

23        THE COURT:  Do you have a copy in front of the witness?

24        MR. NOH:  Yes, Your Honor.

25        THE COURT:  All right.  And you've seen that information

1    before, correct?

2            MS. LEE:  Yes, I did.

3            THE COURT:  All right.  And it charges the corporation

4    with criminal conduct.  Do you understand that?

5            MS. LEE:  Yes, I do understand.

6            THE COURT:  All right.  And as part of this plea

7    agreement, the parties have -- the corporation has agreed to

8    waive an indictment; in other words, to waive the right of a --

9    that the corporation would have to have a grand jury consider

10   charges against the corporation.  Do you understand that?

11           MS. LEE:  Yes, I do understand.

12           THE COURT:  All right.  And to proceed and allow the

13   Government to file an information that's been filed by the U.S.

14   Attorneys' Office charging the corporation with certain criminal

15   conduct, bribery of a public official.  Do you understand that?

16           MS. LEE:  Yes, I do understand.

17           THE COURT:  And essentially the Government charged the

18   Saena Tech Corporation as follows:  And alleges that Saena Tech

19   gave, offered and promised in excess of $250,000 in cash and

20   other things of value, including meals and entertainment, to

21   Public Official C, and for Public Official C's benefit and return

22   for Public Official C using Public Official C's official

23   assistance to direct subcontracts to Saena Tech and providing

24   preferential treatment for Saena Tech with subcontracts awarded

25   through the United States Department of the Army.

1      That's essentially the nature of the charge.  It's called

2  payment of a bribe to a public official in violation of the

3  federal code.  Do you understand that?

4      MS. LEE:  Yes, I do understand.

5      THE COURT:  All right.  All right.  I don't think I have

6  any other questions.  Does the Government -- oh, the waiver of

7  indictment, I've dealt with that.  The waiver of a speedy trial,

8  the speedy trial rights have been tolled through today's date; is

9  that correct, or not?

10     MR. SEELEY:  Yes, Your Honor.  The motion that was filed

11 by the parties is still pending, obviously, that has tolled it.

12     THE COURT:  All right.  So a speedy trial is still tolled

13 until the Court resolves the issue of acceptance or not?

14     MR. SEELEY:  Right.

15     THE COURT:  All right.

16     MR. SEELEY:  So we just ask Your Honor to inquire about

17 whether that waiver is knowing and voluntarily.

18     THE COURT:  All right.

19     MR. SEELEY:  Understanding that it won't be necessary

20 until the Court rules --

21     THE COURT:  Right.  In all likelihood, the speedy trial

22 clock is tolled because the motion for approval of the deferred

23 prosecution agreement is still pending.  My understanding also,

24 though, is that Saena Tech has waived any and all rights to a

25 speedy trial pursuant to the United States Constitution and the

1    Federal Rules of Criminal Procedure for the period of the

2    deferred prosecution agreement.  That would be for the entire

3    period of the deferred prosecution agreement?

4         MR. SEELEY:  Yes, for the two-year period that started

5    March 24th.

6         THE COURT:  All right.  Is that correct, do you understand

7    that?

8         MS. LEE:  Yes, I do understand.

9         THE COURT:  All right.  And I'll sign it.  And you've

10   signed on behalf of Saena Tech and the Government signed, and the

11   Court will approve this this morning, as well as the waiver of

12   indictment.

13        I don't have any other questions.  So this prosecution is

14   deferred for two years.  Do you understand that, from the date

15   that the information was filed in March?

16        MS. LEE:  Yes, I understand.

17        THE COURT:  All right.  Under certain conditions and

18   terms.

19        MS. LEE:  Yes, I know.

20        THE COURT:  All right.  I don't have any other questions.

21        Anything else you wish to -- any other representations you

22   wish to make, Counsel?

23        MR. NOH:  No.

24        THE COURT:  All right.  And is it still your request that

25   the Court approve this deferred prosecution agreement, Ms. Lee?

1          MS. LEE:  That is correct.

2          THE COURT:  All right.  Do you have any questions at all

3    you want to ask me?

4          MS. LEE:  I do not have any questions.

5          THE COURT:  All right.  All right.  Thank you.  I'll take

6    it under advisement.  Thank you.

7          (Recess in proceedings had from 12:03 p.m. until 12:23

8    p.m.)

9          THE COURT:  All right.  Let's proceed with Mr. Kim.

10         MR. BRIZEK:  If we could do like we did before with

11   Mr. Noh having the Korean version in front of him, even though he

12   is conversing in English, perhaps we should start --

13         THE COURT:  Wait a minute.  He's conversant in English?

14         MR. BRIZEK:  He is.

15         THE COURT:  So do we need the interpreter?

16         MR. BRIZEK:  There may be some tight spots where the Court

17   is asking questions, but just to get it precise he might need

18   Korean help; but generally speaking he can read it in English.

19         THE COURT:  Why don't we try that, then, because it's a

20   lot easier if we just try to communicate in English since he's --

21         MR. BRIZEK:  May I just ask the client?

22         (Discussion had off the record between attorney and

23   client.)

24         MR. BRIZEK:  Judge, the client, just to be sure he doesn't

25   miss anything, the Korean would be better.

1          THE COURT:  That's fine.  That's fine.

2          Is he going to testify in Korean at the trial?

3          MR. SEELEY:  I don't know, Your Honor.

4          THE COURT:  All right.  Okay.  All right.

5          Mr. Kim, good afternoon, sir.

6          MR. KIM:  How are you, sir?

7             (JIN SEOK KIM, DEFENDANT IN THE CASE, SWORN)

8          MR. KIM:  Yes, I do.

9          THE COURT:  All right.  How are you today?

10         MR. KIM:  I'm fine.  Thank you, sir.

11         THE COURT:  All right.  What's your date -- I'm going to

12    ask you some background questions.

13         What's your date of birth?

14         MR. KIM:  January 30th, 1958.

15         THE COURT:  All right.  And where were you born?

16         MR. KIM:  I was born in Seoul, Korea.

17         THE COURT:  All right.  How far did you go in school?

18         MR. KIM:  I graduated college.

19         THE COURT:  And you received a degree in what area, what

20    field?

21         MR. KIM:  I received my degree in economics.

22         THE COURT:  All right.  And where did you attend college

23    or university?

24         MR. KIM:  In Seoul, Korea.

25         THE COURT:  All right.  Why are you in court today?

1          MR. KIM:  I'm here to ask approval of DPA.

2          THE COURT:  All right.  When you say DPA, what do you

3     mean?

4          MR. KIM:  My understanding is this is the deferred

5     prosecution.

6          THE COURT:  All right.  And what's your understanding of

7     the deferred prosecution agreement?

8          MR. KIM:  My understanding is that during a certain period

9     of time, the prosecution is deferred and based on the carry out

10    of the agreement.

11         THE COURT:  All right.  And what's required of you under

12    the deferred prosecution agreement?  What's your understanding of

13    what's required of you?

14         MR. KIM:  The first obligation of myself and my company is

15    to pay the penalty of $500,000; and second is to cooperate with

16    the prosecutors, and to prevent any further corrupt activities,

17    establish certain procedures within the company and carry it out.

18    That's my understanding.

19         THE COURT:  All right.  What do you mean by you have an

20    obligation to cooperate with the Government?  What's your

21    obligation consist of?

22         MR. KIM:  My understanding of my obligation is that when

23    there was a demand by the Government, so for certain information,

24    provide the information and appear to do the testing [sic] -- to

25    appear as a witness and present testimony and also appear, if

1        there is a trial, at the trial -- on the trial date.

2              THE COURT:  All right.  And to appear and testify against

3        whom?

4              MR. KIM:  My understanding is the person that was

5        requested by the Government, such as public officials.

6              THE COURT:  Is that enough under this plea agreement or --

7              MR. SEELEY:  Your Honor, in the agreement itself it

8        doesn't say who he's supposed to testify against, but I will

9        tell -- say that Mr. Kim is aware and has been told that he will

10       testify -- is likely to testify against Mr. Lim, Mr. In Seon Lim,

11       in trial in Virginia in September, but there are also other

12       potential defendants out there that Mr. Kim understands that he

13       may have to testify against in the future.

14             THE COURT:  All right.  Thank you.

15             Do you understand that?

16             MR. KIM:  Yes, I do.

17             THE COURT:  Do you know Mr. Lim?

18             MR. KIM:  Yes.

19             THE COURT:  All right.  And do you realize that your

20       agreement with the Government provides that you may be called

21       upon to testify against other individuals who are not named in

22       the deferred prosecution agreement?  Do you understand that?

23             MR. KIM:  Yes, I do.

24             THE COURT:  All right.  Now, I want to focus your

25       attention on the information that's been filed in this case.  Do

1    you have a copy in front of you?

2         MR. KIM:  Yes, there is.

3         THE COURT:  And that's information filed against Saena

4    Tech Corporation.  Do you understand that?

5         MR. KIM:  Yes, I do.

6         THE COURT:  All right.  And the Government has asked this

7    Court to defer -- to approve an agreement that defers prosecution

8    of that corporation.  Is that your understanding?

9         MR. KIM:  Yes, I do.

10        THE COURT:  All right.  And what's your relationship to

11   the corporation?

12        MR. KIM:  I'm working as the managing director of that

13   company.

14        THE COURT:  All right.  Are you related to anyone else who

15   has a position of authority with the corporation?

16        MR. KIM:  The chief executive officer, Mi Kyoung Lee, is

17   my wife.

18        THE COURT:  All right.  And in her capacity as the chief

19   officer of the corporation, Ms. Lee, and my understanding is you

20   as well, have waived any conflict of interest in having the same

21   attorney represent you as well as the corporation; is that

22   correct?

23        MR. KIM:  That is correct.

24        THE COURT:  Do you have any questions about that?

25        MR. KIM:  I do not have.

1      THE COURT:  All right.  Now, actually, he's not a

2  signatory to the DPA itself, though, is he?

3      MR. SEELEY:  He is, Your Honor, on page 13.

4      THE COURT:  On page 13?  All right.

5      All right.  Looking at page 13 of the deferred prosecution

6  agreement, do you see your signature on that page?

7      MR. KIM:  That is correct.

8      THE COURT:  All right.  Did you read this document before

9  you signed -- is that your signature?  You said yes?

10      MR. KIM:  Yes.

11      THE COURT:  Did you read the document before you signed it

12  or after you signed it?

13      MR. KIM:  After I read it.

14      THE COURT:  All right.  And there's also attached to the

15  documents in this case what we call a statement of facts.  Have

16  you seen that document as well?

17      MR. KIM:  Yes, I see it.

18      THE COURT:  All right.  And that has your signature as

19  well, does it not?

20      MR. KIM:  Yes, correct.

21      THE COURT:  All right.  Did you sign that document before

22  you read it or after you read it?

23      MR. KIM:  After I read it.

24      THE COURT:  All right.  Is what's set forth in the

25  statement of facts true?

1          MR. KIM:  Yes, they are.

2          THE COURT:  Is there anything that you do not understand

3     in the statement of facts?

4          MR. KIM:  No, there isn't any.

5          THE COURT:  All right.  And particularly, paragraphs --

6     paragraph 18, 19 and 20, you read everything in those paragraphs

7     word for word, correct?

8          MR. KIM:  Yes, I did read it.

9          THE COURT:  And it provides -- those paragraphs that you

10    gave cash to Official C; is that correct?

11         MR. KIM:  That is correct.

12         THE COURT:  And you knew when you gave that money to

13    Official C that that was a crime, did you not?

14         MR. KIM:  Yes, that is correct.

15         THE COURT:  All right.  And the Government has agreed to

16    not prosecute you in exchange for, not only your testimony, but

17    certain other commitments, not only your testimony against that

18    individual, but your potential testimony against other

19    individuals, correct?

20         MR. KIM:  Yes, correct.

21         THE COURT:  All right.  And precisely, referring to page 8

22    of the English version of the deferred prosecution agreement,

23    paragraphs 10 and 11, that's the consideration for the agreement,

24    correct?

25         MR. KIM:  I do understand.

```
 1          THE COURT:  All right.  And that if you fully comply with

 2   all of your obligations under the agreement, the Office of U.S.

 3   Attorney, the Government, will not continue the criminal

 4   prosecution against the company and will not prosecute you as

 5   described in paragraph 7 of the agreement.  Do you understand

 6   that?

 7          MR. KIM:  Yes, I do.

 8          THE COURT:  All right.  And take a look at page -- strike

 9   that -- paragraph 7, which appears on page 6 of the deferred

10   prosecution agreement.  And you've read that, correct?

11          MR. KIM:  Yes, I did read it.

12          THE COURT:  All right.  You don't have any questions about

13   any of this, correct?

14          MR. KIM:  I do not have.

15          THE COURT:  All right.  Do you have any questions you want

16   to ask the Court?

17          MR. KIM:  I do not have any.

18          THE COURT:  All right.  With respect to speedy trial and

19   waiver of indictment, does that really pertain to this witness or

20   not?

21          MR. SEELEY:  No, Your Honor.

22          THE COURT:  I didn't think so.  All right.

23          Are you entering into this agreement voluntarily and of

24   your own free will or have you been forced to enter into this

25   agreement?
```

1         MR. KIM:  I'm doing it voluntarily.

2         THE COURT:  All right.  Going back to page 8 of the

3    English version, there's a section that's captioned "Breach of

4    the Agreement."  Do you see that?

5         MR. KIM:  Yes.

6         THE COURT:  And that's paragraphs 12 through 15, correct?

7         MR. KIM:  Yes, that is correct.

8         THE COURT:  All right.  And that sets forth what could

9    happen in the event there's a breach of the agreement by you.  Do

10   you understand that?

11        MR. KIM:  Yes, I do understand.

12        THE COURT:  Essentially what it means is the Government

13   can do whatever it wants to do.  It can prosecute you for

14   whatever crimes there are that arise out of this scheme.  Do you

15   understand that?

16        MR. KIM:  Yes, I do understand.

17        THE COURT:  And use against you any evidence the

18   Government has, whether that evidence has been provided by you or

19   not.  Do you understand that?

20        MR. KIM:  Yes, I do understand.

21        THE COURT:  All right.  So just to be clear, when you gave

22   that money -- those money payments to Public Official C, you knew

23   that what you were doing was unlawful, then, correct?

24        MR. KIM:  Yes, I knew it.

25        THE COURT:  All right.  And you recognize that in the

1    event that you do not testify truthfully against any individuals

2    the Government wants you to testify against, or if you otherwise

3    breach the deferred prosecution agreement with the Government,

4    the Government can prosecute you for any crimes arising out of

5    this scheme.  Do you understand that?

6         MR. KIM:  Yes, I know.

7         THE COURT:  And when I say this scheme, I'm referring to

8    bribery.  Do you understand that?

9         MR. KIM:  Yes, I know it.

10        THE COURT:  All right.  Do you have any questions you want

11   to ask me?

12        MR. KIM:  I do not have any.

13        THE COURT:  Is there anything about this proceeding or

14   about this deferred prosecution agreement that you do not

15   understand?

16        MR. KIM:  I do not have any.

17        THE COURT:  Are you satisfied with the services of your

18   attorney?

19        MR. KIM:  Yes, I am satisfied.

20        THE COURT:  All right.  I have no further questions,

21   Counsel.

22        Are there any other questions the Government wants the

23   Court to ask?

24        MR. SEELEY:  No, Your Honor.

25        THE COURT:  Defense counsel?

1          MR. BRIZEK:  No.

2          THE COURT:  All right.  What I'll probably do is -- well,

3     what I'm going to do is take this under advisement.  I'll issue

4     an order that requires the Government to address some legal

5     issues that have come up during the course of this proceeding.

6     I'm not going to pick another date now, although maybe I should

7     pick another date now since everyone's in court.  I should do

8     that now, but I'm going to speak with my staff first before I

9     pick another date.

10         I do have a couple of additional questions to ask the

11    corporate representative, so if she will return to the stand,

12    Ms. Lee.

13         All right.  You may have a seat, sir.

14         (Mr. Kim excused.)

15         (Ms. Lee returned to the stand to answer questions from

16    the Court.)

17         THE COURT:  I neglected to ask you a couple of questions.

18         And I'll ask you the same question that I asked Mr. Kim:

19    Are you satisfied with the services of your attorneys?

20         MS. LEE:  Yes, I am satisfied.

21         THE COURT:  All right.  Are there any questions you want

22    to ask me?

23         MS. LEE:  I do not have any.

24         THE COURT:  Is there anything about this proceeding that

25    you do not understand?

1          MS. LEE:  No, I do not have any.

2          THE COURT:  All right.  Is there anything about the

3     deferred prosecution agreement that you do not understand?

4          MS. LEE:  I do not have any.

5          THE COURT:  All right.  And did anyone force you in your

6     position as a corporate officer to enter into this agreement,

7     force you or otherwise on coerce you to enter into this deferred

8     prosecution agreement on behalf of Saena Tech?

9          MS. LEE:  No one forced me.

10         THE COURT:  All right.  All right.  Thank you.

11         (Mr. Lee excused.)

12         THE COURT:  I'll look at the calendar for a second.

13         All right.  Counsel, I'm looking at September the 5th at

14    10:00 for resumption of this hearing, and by that time -- the

15    Court's going to rule on this matter on that date, I can assure

16    you of that.  Is that a bad date or bad time, September the 5th

17    at 10?

18         MR. SEELEY:  That's fine for the Government.

19         THE COURT:  All right.  And Mr. Kim and Ms. Lee would have

20    to be here as well.  Is that a bad date for counsel?

21         MR. BRIZEK:  The date is fine more me, Judge.

22         THE COURT:  Good.

23         MR. BRIZEK:  Did the court say that both would be --

24         THE COURT:  I think they should be here.  I mean, I'm

25    taking it under advisement.  They should be here.  It's a

1   criminal proceeding.

2          MR. BRIZEK:  May -- if at all possible, if that could be

3   waived.  They're going to be here -- or Mr. Kim certainly will be

4   here later in September, and --

5          THE COURT:  Right.  You know what, I don't have any

6   problems with their waiving their appearance, but they'll have to

7   sign a written -- does the Government object?

8          MR. SEELEY:  No.  I think that's fine to proceed that way,

9   Your Honor.

10         THE COURT:  All right.  Actually, they can both tell me

11  now that they wish to -- if that's what they want to, if they

12  wish to voluntarily waive their presence on that day.  I don't

13  have any problems with that.

14         MR. BRIZEK:  Should we submit something in writing?

15         THE COURT:  Well, if they want to tell me on the record,

16  if they can tell me here now since they're here and you can

17  follow it up with a written waiver, that's fine.

18         MR. BRIZEK:  Perhaps if I could just do that.

19         THE COURT:  Why don't you talk to them first and tell them

20  what right they're giving up, though.  Do you want to talk to

21  your clients first just to tell them what they're giving up?

22         MR. BRIZEK:  May I --

23         THE COURT:  Well, let me just say this:  Mr. Kim and

24  Ms. Lee, you both have the right to be here on September the 5th.

25  I'm continuing this matter until September the 5th.

1          Do you understand that Mr. Kim?  And Ms. Lee, do you

2    understand that?

3          MR. KIM:  Yes.

4          MS. LEE:  (Nodded head affirmatively.)

5          THE COURT:  All right.  Your attorney has indicated that

6    you may wish to waive your appearance, you may wish to waive your

7    right to be here on that date, and that's perfectly fine with me

8    if you'd like to waive your appearance, Mr. Kim.  Do you

9    understand that, in other words, not be here?

10         MR. KIM:  Yes.

11         THE COURT:  Ms. Lee, do you understand you have the right

12   to be here on September the 5th?

13         MS. LEE:  Yes, I do.

14         THE COURT:  All right.  And your attorney has indicated

15   that you may wish to waive your right to be here on that date.

16   Do you understand that?

17         MS. LEE:  Yes, I do.

18         THE COURT:  You don't have to make a decision today.  You

19   can talk to your attorney.  If you wish to waive your right you

20   can file a written waiver.  Do you understand that, Ms. Lee?

21         MS. LEE:  (Nodded head affirmatively.)  Yes, I do.

22         THE COURT:  And Mr. Kim, do you understand that?

23         MR. KIM:  Yes.

24         THE COURT:  Do you have any questions about your

25   Constitutional right to be present at any stage of the

```
 1    proceedings?  Do you have any questions about that, Mr. Kim?
 2          MR. KIM:  I do not have any.
 3          THE COURT:  Ms. Lee, do you have any questions you want to
 4    ask me about that?
 5          MS. LEE:  I do not have any.
 6          THE COURT:  Okay.  And if you wish to be present, that's
 7    fine.  If you wish to waive your presence, then I'll need a
 8    written waiver signed by you, and your attorney will prepare
 9    that.  All right, Ms. Lee?
10          MS. LEE:  Yes.
11          THE COURT:  Mr. Kim?
12          MR. KIM:  Yes.
13          THE COURT:  All right.  That's fine.  If you wish to
14    waive, that's fine, just give me a written waiver.
15          All right.  Anything further, Counsel?
16          MR. SEELEY:  No, Your Honor.
17          THE COURT:  All right.  Thank you.  Thank you.  Thank you,
18    folks.  Thank you, Counsel.  Let me thank the interpreters.  All
19    right.  Thanks.  Have a nice day.
20          (Proceedings adjourned at 2:49 p.m.)
21
22
23
24
25
```

# C E R T I F I C A T E

I, Scott L. Wallace, RDR-CRR, certify that
the foregoing is a correct transcript from the record of
proceedings in the above-entitled matter.


```
----------------------------        ----------------
```
**Scott L. Wallace, RDR, CRR          Date
     Official Court Reporter**